UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHARTER OPERATORS OF ALASKA, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | 11-cv-00664 (RCL) |
| REBECCA BLANK, Secretary, Department of Commerce, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pacific Halibut are a highly desired catch off the coast of Southeast Alaska.  Through the National Marine Fisheries Service ("NMFS"), the Secretary of Commerce ("Secretary") has issued a formal rule ("Final Rule") creating a limited access system[1] for charter vessels engaged in guided sport fishery for halibut in a designated area in the Central Gulf of Alaska.  *See* Fed. Reg. 554 (adopted Jan. 5, 2010; effective Feb. 1, 2010); 50 C.F.R. §§ 300.61, 300.66, 300.67.  The plaintiffs, Charter Operators of Alaska,[2] allege that the Secretary[3] violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by adopting the Final Rule.

---

[1] A limited access system, as defined by the Magnunson-Stevens Act, is a "system that limits participation in a fishery to those satisfying certain eligibility criteria or requirements contained in a fishery management plan or associated regulation."  16 U.S.C. § 1802(27).

[2] The plaintiffs are the following: Charter Operators of Alaska; Alaska's Kodiak Island Resort, LLC; Captain Allen Walburn; Crystal Bay Lodge, LLC; Captain Nicolas Ausman.

[3] Defendants are: Rebecca Blank, Secretary of the Department of Commerce; Jane Lubchenco, Administrator of the National Oceanic and Atmospheric Administration; and Eric C. Schwaab, Administrator of the National Marine Fisheries Service.  For ease of reference, defendants will be referred to collectively as simply, "the defendants."

Before the Court are the plaintiffs' motion [22] for summary judgment and the defendants' cross-motion [23] for summary judgment. Upon consideration of the filings, the entire record herein and the relevant law, the Court will GRANT the defendants' motion for summary judgment, and the plaintiffs' motion for summary judgment will be DENIED.

## II. BACKGROUND

Under the Northern Pacific Halibut Act (the "Halibut Act"), 16 U.S.C. §§ 773-773k, the Secretary has broad authority and discretion to "adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and the Act." *Id.* § 773c(b)(1); *see* 50 C.F.R. §§ 300.60–300.66. The "Convention" is a treaty between the United States and Canada called the Convention for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea, Ottawa, 1953, 5 U.S.T. 5, T.I.A.S. 2900 (as amended by the Protocol Amending Convention, Washington, 1979, 32 U.S.T. 2483, 2487, T.I.A.S. 9855). Under the Halibut Act, the International Pacific Halibut Commission ("IPHC"), established by the Convention, can recommend regulations regarding Northern Pacific Halibut to the U.S. Secretaries of State and Commerce. 16 U.S.C. § 773c(c). If approved by both Secretaries, the Secretary of Commerce promulgates the regulations via publication in the Federal Register. *Id.*; 50 C.F.R. § 300.62. Congress additionally granted supplemental regulatory authority over halibut to the regional councils created under the Magnunson-Stevens Fishery Conservation and Management Act ("MSA"). *Id.* at 4-5; 16 U.S.C. § 773c(c).

The regional councils have authority to enact regulations that limit access to halibut fisheries and allocate shares of halibut among individual fisherman, so long as the allocations are "fair and equitable to all such fisherman[.]" 16 U.S.C. § 773c(c). The regulations must also be "consistent with the limited entry criteria set forth in section 1853(b) of [the MSA]." *Id.* Section

1853(b)(6) authorizes regional councils to enact limited access systems after taking into account seven specified criteria: (A) present participation in the fishery; (B) historical fishing practices in, and dependence on, the fishery; (C) the economics of the fishery; (D) the capability of fishing vessels used in the fishery to engage in other fisheries; (E) the cultural and social framework relevant to the fishery and any affected fishing communities; (F) the fair and equitable distribution of access privileges in the fishery; (G) and any other relevant considerations. 16 U.S.C. § 1853(b)(6)(A)-(G).

In April 1997, the North Pacific Fishery Management Council ("North Pacific")[4] began considering the possibility of implementing a limited access system to address the problem of open access in the halibut charter vessel fleet. Defs.' Mot. at 9. In February 2006, North Pacific published an announcement, establishing a "control date" of December 9, 2005. *Id.* at 10. The publication conveyed that anyone entering the halibut fishing industry after the control date would not be guaranteed future access should North Pacific implement a limited access system. *Id.*

In December 2008, North Pacific promulgated a different rule, limiting charter fishermen to a one-fish daily bag limit in Area 2C of the Gulf of Alaska territory. *Id.* at 11. This Court reviewed and upheld that rule in November 2009. *Van Valin v. Locke*, 671 F. Supp. 2d 1 (D.D.C. 2009) (Collyer, J.).

In January 2010, North Pacific published the Final Rule, which enacted a limited access system for charter vessels in the guided sport fishery for Pacific halibut in two areas of the Gulf of Alaska. *Id.* at 13. The Final Rule limited the number of charter vessels that may participate in the guided sport fishery for halibut in the outlined areas. *Id.* After enactment, all halibut guided

---

[4] North Pacific is the regional council with jurisdiction to regulate fisheries in the Gulf of Alaska. Defs.' Mot. at 5 n.2; 16 U.S.C. § 1852(a)(1)(G).

3

sport fishery vessels were required to obtain a permit. *Id.* In order to qualify for a charter permit, the applicant needed to meet two qualifications: (1) minimum participation in either 2004 or 2005, and (2) minimum participation in 2008.[5] *Id.* Depending on the number of logged trips, applicants either qualified for a transferrable or nontransferable permit. *Id.* at 14.

Because the plaintiffs did not meet the minimum participation requirements, they did not qualify to receive any permits under the Final Rule. The plaintiffs filed this complaint in April 2011 and simultaneously moved for a preliminary injunction to enjoin the implementation of the Final Rule. The Court (per Judge Sullivan) heard oral arguments on the motion and issued a bench ruling on April 26, 2011. The Court found that the plaintiffs failed to show a likelihood of success on the merits, and denied the plaintiffs' motion. Because the Administrative Record had not been assembled at that time, the Court felt it was premature to issue a ruling on the merits. With the parties' motions for summary judgment now ripe for review, the Court will examine the merits.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). However, in a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C.

---

[5] Minimum participation is defined as:
>  [D]ocumentation of at least five logbook fishing trips during one of the qualifying years-2004 or 2005-and at least five logbook fishing trips during 2008. Meeting these minimum participation qualifications could qualify an applicant for a non-transferable charter halibut permit. The minimum participation qualifications for a transferable charter halibut permit include at least 15 logbook fishing trips during one of the qualifying years-2004 or 2005-and at least 15 logbook fishing trips during 2008. The basic unit of participation for receiving a charter halibut permit will be a logbook fishing trip.

75 Fed. Reg. at 555.

4

§ 706, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 81 (D.D.C. 2007); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006). Under the APA, the agency's role is to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the district court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985). Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

The plaintiffs challenge the Final Rule under the APA as violating the requirements of the Halibut Act and the MSA. Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has " 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *Alpharma, Inc. v. Leavitt,* 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.* at 416. That inquiry is confined to the administrative record, subject to limited

exceptions not applicable here. *See Camp v. Pitts,* 411 U.S. 138, 142 (1973) ( "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## IV. ANALYSIS

The plaintiffs point to a number of infirmities in the Final Rule. Their primary argument, advanced in Count I of the Complaint, is that the defendants violated the Halibut Act by approving a rule that is not "reasonably calculated to promote conservation." Pls.' Mot. at 4. The plaintiffs further contend that the Final Rule fails to comply with the limited access provisions of the MSA outlined in 16 U.S.C. § 1853(b)(6). *Id.* at 5. Lastly, the plaintiffs assert that the Final Rule violates the Halibut Act by not allocating fishing rights in a fair or equitable manner. *Id.* at 11.

### A. Allegation That The Final Rule Was Not Reasonably Calculated to Promote Conservation

In Count I, the plaintiffs contend that the Final Rule is inconsistent with the Halibut Act, which requires that "if it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be . . . reasonably calculated to promote conservation." 16 U.S.C. § 773c(c). In support of this, the plaintiffs cite to the Final Rule's language, stating that the Final Rule will not limit halibut harvest, but instead, will manage the growth of fishing capacity by curtailing the charter halibut fishery. Pls.' Mot. at 5; 75 Fed. Reg. at 571. Thus, the plaintiffs argue that the Final Rule was designed to economically consolidate the industry, and it serves no conservation purpose. Pls.' Opp'n at 4.

The defendants argue they are entitled to summary judgment because the Final Rule does indeed promote conservation. Defs.' Mot. at 17. The defendants assert that the Final Rule is a first step in developing a long-term solution to ongoing conservation concerns, and that short-

term growth concerns were addressed by the one-fish daily bag minimum rule promulgated in 2008. *Id.* The defendants further assert that the Final Rule will "make existing and future harvest restrictions more effective because conservation gains from individual harvest restrictions will not be eroded by unlimited growth in the fleet of charter vessels fishing for halibut." *Id.*; 75 Fed. Reg. at 563. Additionally, the defendants contend that the Final Rule is expected to "minimize the potential for speculative investment and participation in the charter fishery." Defs.' Mot. at 17.

As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n, v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see Henley v. FDA,* 77 F.3d 616, 621 (2d Cir. 1996). Rather, the agency action under review is "entitled to a presumption of regularity" and the court must consider only whether the agency decision was based on relevant factors and whether there has been a clear error of judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977). In cases involving scientific or technical decisions within the agency's area of expertise, the agency is entitled to a "high level of deference." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1320 (D.C. Cir. 1998). Regarding fishery management decisions, like the one at issue here, it is especially appropriate for a court to defer to the agency's choice of "appropriate conservation and management measures based on [its] evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst. v. Mosbacher,* 732 F. Supp. 210, 223 (D.D.C. 1990).

Although the plaintiffs argue that the Final Rule will not limit the actual halibut harvest, the Halibut Act does not specify that conservation *can only* be achieved by reducing the halibut

harvest in the short term. Further, the Ninth Circuit held, and this Court agrees, that unlimited access tends to cause a decline in fisheries because as more boats enter the region, fewer fish escape and live to reproduce. *Alliance Against IFQs v. Brown*, 84 F.3d 343, 344, 350 (9th Cir. 1996). The plaintiffs offer no response to the defendants' arguments that long-term conservation concerns will be more easily managed by the Final Rule. Therefore, because the plaintiffs provide no statutory or regulatory support for requiring the Final Rule to reduce the halibut harvest in the short term, and additionally, because the plaintiffs have not discredited the defendants arguments in support of the Final Rule's conservation purposes, the Court finds that the Final Rule complies with the Halibut Act in this respect.

   **B.**  **Allegation That The Final Rule Does Not Comply with 16 U.S.C. § 1853(b)(6)**

Section 773c(c) of the Halibut Act states that all regulations "shall be consistent with the limited entry criteria set forth in section 1853(b)(6) of [the MSA]." 16 U.S.C. § 773c(c). Section 1853(b)(6) of the MSA states the following:

> (b) **Discretionary provisions**
> Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may—
>> (6) Establish a limited access system for the fishery in order to achieve optimum yield if, in developing such a system, the Council and the Secretary take into account—
>> (A) present participation in the fishery;
>> (B) historical fishing practices in, and dependence on, the fishery;
>> (C) the economics of the fishery;
>> (D) the capability of fishing vessels used in the fishery to engage in other fisheries;
>> (E) the cultural and social framework relevant to the fishery and any affecting fishing communities;
>> (F) the fair and equitable distribution of access privileges in the fishery; and
>> (G) any other relevant considerations

   **1.**  **Defendants Were Not Required to Establish An Optimum Yield**

The plaintiffs argue they are entitled to summary judgment on their second claim because Pacific North failed to develop a fisherman management plan ("FMP") that established an optimum yield for halibut prior to implementing the Final Rule. *Id.* at 7.

The defendants argue that the Halibut Act does not require them to develop a fishery management plan ("FMP") or specify an optimum yield for halibut because the plain language references only the *criteria* set forth in § 1853(b)(6). Defs.' Mot. at 21. The defendants further argue that because the language in the MSA requiring the development of an FMP and optimum yield precedes the criteria specifically referenced in the Halibut Act, "the Court should not impose additional conditions for development of a limited access rule beyond those specified[.]" *Id.*

The Halibut Act does not expressly require that regional councils, such as North Pacific, establish FMPs or optimum yield estimates. The plain language of the statute merely references that any regulations regarding limited access systems be consistent with the criteria set forth in the MSA. The provisions cited by the plaintiffs in their argument clearly precede the seven enumerated criteria set forth in § 1853(b)(6)(A)-(G). Additionally, if the statute is silent or ambiguous, it is the court's duty to determine only whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984). The defendants argue that if Congress wanted to require the defendants "to develop a fishery management plan or specify optimum yield for halibut, they could have said so." Defs.' Mot. at 21. Because the statute expressly identifies the criteria and does not mention any requirements regarding an FMP or optimum yield, the Court cannot find that the agency's actions were an impermissible construction of the statute.

### 2.   The Defendants Adequately Considered the Economics of the Fishery

The plaintiffs further argue that the defendants failed to properly assess the economic impact of the Final Rule, as required by § 1853(b)(6)(C). *Id.* More specifically, the plaintiffs contend that the economic analysis conducted by Pacific North was deficient because it was mainly qualitative in nature and did not analyze the impact on the small charter businesses negatively affected by the Final Rule. *Id.* at 8.

The defendants argue in response that North Pacific took into account the economic analysis in both the Regulatory Impact Review and Final Regulatory Flexibility Analysis. Defs.' Mot. at 23. The defendants point out that the Final Regulatory Flexibility Analysis alone contains seventeen pages of analysis detailing the Final Rule's impact on small businesses, non-profits, and governments. *Id.* Additionally, the defendants assert that the dual-qualifying time period requirements were chosen because charters fulfilling both demonstrated an acceptable level of dependence on the charter halibut fishery. 75 Fed. Reg. at 586. Additionally, the defendants assert that the Final Rule's economic analysis considered the promotion of developing the charter industry in under-developed rural communities and accordingly allocated permits to community quota entities[6] ("CQE") in order to bolster these areas. Defs.' Mot. at 25.

As the Court previously noted, the arbitrary and capricious standard is a narrow one and a court should not replace the agency's judgment for its own. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Again, the plain language of the statute does not require, as the plaintiffs argue, that North Pacific perform an extensive quantitative analysis of the Final Rule's impact on small businesses. The plaintiffs offer no reason why the economic analysis the defendants provided is insufficient. Merely highlighting the fact that the Final Rule will cause some charter operations to suffer adverse economic impacts is not sufficient for this Court to find the agency acted in an arbitrary and capricious manner.

---

[6] Community quota entities are those without a fully developed charter fleet. 75 Fed. Reg at 558.

C.	**Allegation That The Final Rule is Not Fair And Equitable**

Count III of the Complaint alleges that the Final Rule is not fair and equitable under the Halibut Act because it takes away charter fishing trips from 327 ongoing businesses who did not qualify under the two-prong participation requirements. Pls.' Mot. at 12. The plaintiffs argue that because the Final Rule allegedly has no conservation purpose, putting certain charters out of business and allowing others to remain is not "fair and equitable to all fishermen." *Id.*

The defendants argue in response that the 2006 announcement of a control date provided notice to the industry that anyone entering after that date would not be assured future access. Defs.' Mot. at 28. Further, the defendants assert that the plaintiffs were aware of the control date and submitted comments to the proposed rule. *Id.* at 31. The defendants additionally contend that the Final Rule promotes equity by allocating non-transferrable permits to operators with lower levels of qualifying participation, and additionally, allocates CQE permits to help rural communities develop their charter sector. *Id.* at 29. Further, the defendants reiterate their earlier argument that Pacific North promulgated the Final Rule in order to constrain the unrestricted growth in the halibut fishery and promote long-term conservation. *Id.* at 31.

The Halibut Act requires that, "[i]f it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be fair and equitable to all such fisherman[.]" 16 U.S.C. § 773c(c). When determining fairness and equity, the focus is on the purpose of a regulation and not its impact. *Van Valin*, 671 F. Supp. 2d at 11 ("So long as the motive behind the regulation is justified in terms of the fishery management objective, advantaging one group over another is permissible."); *see also Alliance Against IFQs*, 84 F.3d at 350 (holding that an adverse impact on the lives of fishermen alone does not make a plan arbitrary and capricious). Additionally, the Third Circuit recently held that the publication

of a control date gave sufficient notice to fishermen that future access may be restricted. *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F. 3d 106, 114 (3d Cir. 2011).

Here, the plaintiffs do not challenge that the control date provided them notice in 2006. Instead, the plaintiffs primarily use this cause of action to again argue that the Final Rule has no conservation purpose, and therefore, it is unfair that they be forced out of the marketplace. Because the Court already addressed the plaintiffs' conservation allegation, it will not address this argument here. Additionally, in deciding a similar APA claim, the Ninth Circuit recently reasoned that "[d]espite the harshness to the fishermen who were left out, there is no way we can conclude on this record that the Secretary lacked a rational basis for leaving them out." 84 F.3d at 350 (holding that an adverse impact on the lives of fishermen who have done nothing wrong is an unavoidable consequence of the statutory scheme). This reasoning rings true when applied to the plaintiffs' fair and equitable allegations. Here, the defendants published a control date to the fishing community four years before enacting the Final Rule. Further, the Final Rule's two prong qualifying requirement attempted to include those fishermen who were more likely to depend on the charter fishery for their livelihood. 75 Fed. Reg. at 560. Additionally, the plaintiffs do not respond to the defendants' assertions that the Final Rule does promote fairness and equity by benefiting rural communities and providing nontransferable permits. Indeed, the plaintiffs' arguments rely solely on their allegation that economic consolidation without a conservation purpose is arbitrary and capricious. Therefore, the plaintiffs fail to prove that the Final Rule lacks fairness and equity, and the Court accordingly grants summary judgment for the defendants on Count III.

V.   **CONCLUSION**

For the foregoing reasons, the Court GRANTS the defendant's motion [23] for summary judgment, and the plaintiffs' motion [22] for summary judgment is DENIED.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on February 24, 2012.